# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ZAFFEREINE AMIT MCGILBRA, | Case No.: 3:20-cv-00324-MMD-WGC |
| Plaintiff | **Report & Recommendation of United States Magistrate Judge** |
| v. | Re: ECF No. 37 |
| NAPHCARE MEDICAL BILLING, et. al., | |
| Defendants | |

This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is defendant NaphCare's Motion for Summary Judgment. (ECF No. 37.) Plaintiff filed two responses. (ECF Nos. 42, 43.) NaphCare filed a reply. (ECF No. 44.) Plaintiff filed a sur-reply (ECF No. 48), which should be stricken under Local Rule 7-2(g) because he did not seek leave of court before filing the sur-reply.

After a thorough review, it is recommended that NaphCare's motion be denied.

## I. BACKGROUND

Covid-19 is a disease caused by the SARS-CoV-2 virus which spreads when an infected person breathes out droplets and small particles containing the virus. The virus was discovered in December 2019 in Wuhan, China, and quickly spread around the world resulting in a global pandemic. To date, over 684,000 people have died from Covid-19.[1] Due to the close living

---

[1] *See* https://www.cdc.gov/coronavirus/2019-ncov/, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Basics, https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html, last visited September 27, 2021.

arrangements inside correctional facilities, staff and inmates are at greater risk for contracting Covid-19.[2]

Plaintiff is an inmate in the custody of the Washoe County Detention Facility (WCDF), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 7.) The court screened Plaintiff's amended complaint and allowed him to proceed with a municipal due process claim against NaphCare based on allegations that NaphCare had a policy or custom of failing to take proper precautions to prevent the spread of Covid-19. (ECF No. 8.) Specifically, Plaintiff alleges that NaphCare staff were not wearing masks "or Covid-19 gear" and inmates were not tested for Covid-19. Plaintiff claims that NaphCare does not screen new inmates or staff coming or going from WCDF for Covid-19, that very few people were wearing masks or keeping six-foot distance, which put him and others at risk of contracting the virus. (ECF No. 7 at 6.)

Plaintiff was also allowed to proceed with a municipal due process claim against Washoe County based on allegations that Washoe County had a custom or policy of unreasonably not requiring people at WCDF to take well-known precautions, such as wearing masks and social distancing, to prevent the spread of Covid-19 to people such as Plaintiff. (ECF No. 8.) Plaintiff's other claims were dismissed. (*Id*.)

Defendant NaphCare moves for summary judgment arguing that there are no disputed facts and NaphCare did not act with reckless disregard for Plaintiff's serious health needs.

---

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/living-prisons-jails.html, last visited September 28, 2021.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

1  pleadings and set forth specific facts by producing competent evidence that shows a genuine
2  dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

3  **III. DISCUSSION**

4  **A. Discovery**

5      In his first response to NaphCare's motion, Plaintiff states that a subpoena he sought was
6  never served on the defendants, and so he was denied the right to discovery. In addition, he states
7  that to discern the widespread custom of indifference, he wants NaphCare to produce a
8  comprehensive list of prisons and jail facilities with whom it has contracted to provide health
9  care services. Finally, he asks to be able to write to prisoners and detainees in other facilities
10 pursuant to Rule 56(f). (ECF No. 42 at 1-2.)

11     Plaintiff references Federal Rule of Civil Procedure 56(f), but that section of the rule
12 governs judgment independent of the motion. Instead, the court construes Plaintiff's request as
13 one for relief under Rule 56(d). That rule provides that "[i]f a nonmovant shows by affidavit or
14 declaration that, for specified reasons, it cannot present facts essential to justify its opposition,
15 the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or
16 declarations or take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

17     "Rule 56(d) provides a 'device for litigants to avoid summary judgment when they have
18 not had sufficient time to develop affirmative evidence.'" *Stevens v. Corelogic, Inc.*, 899 F.3d
19 666, 678 (9th Cir. 2018) (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000
20 (9th Cir. 2002)). "A party seeking additional discovery under Rule 56(d) must 'explain what
21 further discovery would reveal that is essential to justify [its] opposition to the motion[ ] for
22 summary judgment.'" *Id*. (quoting *Program Eng'g, Inc. v. Triangle Publ'ns, Inc.*, 634 F.2d 1188,
23 1194 (9th Cir. 1980) (alterations original, quotations omitted).

1    "In particular, '[t]he requesting party must show [that]: (1) it has set forth in affidavit

2  form *the specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and

3  (3) the sought-after facts are essential to oppose summary judgment.'" *Id*. (quoting *Family Home

4  & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008)) (emphasis

5  and alteration original).

6          On November 30, 2020, the court granted Plaintiff's request to subpoena video footage,

7  medical visits, inquiries and digitally stored grievances from the Washoe County Detention

8  Facility. The court reminded Plaintiff that granting him leave to proceed *in forma pauperis* did

9  not extend to the issuance of subpoenas at government expense, *i.e.*, all costs and attendant

10 witness fees associated with service of the subpoena are to be borne by Plaintiff. (ECF No. 23.)

11 Plaintiff subsequently filed a motion requesting another blank subpoena for this information,

12 stating that while the previous order was granted, it seems that the subpoena was never served on

13 the records clerk. (ECF No. 47.) On July 12, 2021, the court granted the request to issue a blank

14 subpoena, but reminded Plaintiff to consult the Federal Rules of Civil Procedure and Local Rules

15 to determine how the subpoena should be served. (ECF No. 49.)

16         Importantly, Plaintiff does not include a declaration or affidavit to support his request, as

17 is required by the rule. Nor does he set forth the facts he hopes to elicit from further discovery or

18 how they are essential to oppose NaphCare's motion for summary judgment.

19         Plaintiff's response also asks for NaphCare to provide him a list of facilities with whom it

20 contracts to provide healthcare, but Plaintiff does not explain how that information would show

21 that NaphCare violated Plaintiff's constitutional rights at WCDF.

22

23

1    Finally, Plaintiff asks to be able to write to inmates and detainees in other facilities, but

2    does not describe what facts he seeks to elicit from those inmates/detainees. Nor does he explain

3    why he did not seek to conduct this discovery earlier or seek to extend the discovery deadline.

4    For these reasons, Plaintiff's request under Rule 56(d) should be denied.

5    **B. Motion for Appointment of Counsel**

6    Plaintiff's first response to NaphCare's motion also contains a request for the

7    appointment of counsel. Plaintiff states that he is unable to afford counsel, his imprisonment

8    limits his ability to litigate, and the issues involved in this case are complex and would likely

9    involve conflicting testimony. (ECF No. 42 at 2-3.)

10   The undersigned has denied Plaintiff's previous requests for the appointment of counsel.

11   (*See* ECF Nos. 24, 26, 52, 53.) As the court pointed out to Plaintiff then, a litigant in a civil rights

12   action does not have a Sixth Amendment right to appointed counsel. *Storseth v. Spellman*, 654

13   F.2d 1349, 1353 (9th Cir. 1981). In very limited circumstances, federal courts are empowered to

14   request an attorney to represent an indigent civil litigant. The circumstances in which the court

15   will grant such a request, however, are exceedingly rare, and the court will grant the request only

16   under extraordinary circumstances. *United States v. 30.64 Acres of Land,* 795 F.2d 796, 799-800

17   (9th Cir. 1986); *Wilborn v. Escalderon*, 789 F.2d 1328, 1331 (9th Cir. 1986).

18   A finding of exceptional or extraordinary circumstances requires the court to evaluate

19   Plaintiff's likelihood of success on the merits and his ability to articulate his claims in light of the

20   complexity of the legal issues involved. Neither factor is controlling; both must be viewed

21   together in making the finding. *Terrell v. Brewer*, 935 F.2d 1015, 1017 (9th Cir. 1991) (citation

22   omitted).

23

7

To date, Plaintiff has been able to adequately articulate his claims. Plaintiff has not addressed, let alone demonstrated, a likelihood of success on his claims. Nor has he shown that the complexity of the legal issues involved are sufficient to require the appointment of counsel. The claims are fairly straightforward: whether the Defendants had sufficient precautions prevent the spread of Covid-19 within the jail.

As such, Plaintiff's third request for the appointment of counsel should also be denied.

**C. Claim vs NaphCare**

**1. Legal Standard**

Correctional officials must provide inmates with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995).

Preliminarily, it appears Plaintiff was a detainee during the relevant timeframe. Plaintiff testified in his deposition that he was arrested on October 25, 2019, and booked into WCDF that same day. (Pl. Depo., ECF No. 37 at 17-18, depo pp. 18:24-19:3, 25:4-12.) He has been housed at WCDF continuously since. (*Id.* at 25:7-12.)

In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court held that an objective standard under the Due Process Clause applies to an excessive force claim by a detainee. In *Castro v. City of Los* Angeles, the Ninth Circuit held that a detainee's failure to protect claim is analyzed under the Fourteenth Amendment using an objective reasonableness standard. *Castro v. City of Los Angeles,* 833 F.3d 1060 (9th Cir. 2016) (en banc), *cert. denied,* 137 S.Ct. 831 (Jan. 23, 2017). The elements of such a claim are: (1) the defendant made an intentional decision regarding the conditions under which the plaintiff was confined; (2) the conditions put the plaintiff at a substantial risk of serious harm; (3) the defendant did not take

1    reasonable measures to abate that risk; and (4) and this caused the plaintiff's injuries. *Id.* In

2    *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (*Gordon I*), the Ninth

3    Circuit held that medical care claims brought by pretrial detainees are also evaluated under the

4    Due Process Clause using an objective deliberate indifference standard. The elements of such a

5    claim are substantially the same as those announced in *Castro* for failure to protect claims.

6        "*Monell*[3] established that municipalities can be liable for infringement of constitutional

7    rights, under certain circumstances." *Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir.

8    2019) (citation omitted). "In particular, municipalities may be liable under § 1983 for

9    constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a

10    failure to train, supervise or discipline; or (4) a decision or act by a final policymaker." *Id*. at

11    602-03 (citation omitted). "A municipality may not, however, be sued under a *respondeat*

12    *superior* theory[4]." *Id*. (citation omitted); *Castro v. County of Los Angeles* , 833 F.3d 1060, 1073

13    (9th Cir. 2016) (en banc). "A plaintiff must therefore show '*deliberate* action attributable to the

14    municipality [that] directly caused a deprivation of federal rights.'" *Id*. at 603 (quoting *Bd. of*

15    *Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997)).

16        When a private entity, such as NaphCare[5], acts under color of law to perform a

17    traditional, exclusive function in place of a municipality, the plaintiff must establish a policy or

18    custom theory of municipal liability against the private entity. *Tsao v. Desert Palace, Inc.*, 698

19    F.3d 1128, 1139 (9th Cir. 2012).

20

21    _____

[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

22    [4] *Respondeat superior* is a doctrine that holds an employer liable for its employee's wrongful
acts that are committed within the scope of employment.

23    [5] NaphCare is a private corporation, and during the relevant time period had a contract to provide
staff to WCDF to medically treat its inmates. (Cain Decl., ECF No. 37 at 53 ¶ 2.)

"To impose *Monell* liability on a municipality under section 1983, a plaintiff must prove: (1) [the plaintiff] had a constitutional right of which he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [the plaintiff's] constitutional right; and (4) the policy is the moving force behind the constitutional violation." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (*Gordon II*) (citation and quotation marks omitted).

"A plaintiff can satisfy *Monell's* policy requirement in one of three ways." *Id*. (citation omitted). "First, [the municipality] may be held liable when it acts pursuant to an expressly adopted official policy." *Id.* (citation and quotation marks omitted). "Second, a public entity may be held liable for a longstanding practice or custom" such as when the entity "fail[s] to implement procedural safeguards to prevent constitutional violations or, sometimes, when it fails to train its employees adequately." *Id*. (citation and quotation marks omitted). Third, the municipality may be held liable when "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Id*. (citations and quotation marks omitted).

"An unconstitutional policy need not be formal or written to create municipal liability under Section 1983; however, it must be 'so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (citation and quotation marks omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id*. (citation and quotation marks omitted).

Again, "[i]t is not sufficient for a plaintiff to identify a custom or policy, attributable to the municipality, that caused his injury." *Castro*, 833 F.3d at 1076. "A plaintiff must also

1  demonstrate that the custom or policy was adhered to with 'deliberate indifference to the

2  constitutional rights of [the jail's] inhabitants.'" *Id.* (citation and quotation marks omitted).

3       "The Supreme Court has strongly suggested that the deliberate indifference standard for

4  municipalities is always an objective inquiry." *Id.* An "objective standard necessarily applie[s] to

5  municipalities for the practical reason that government entities, unlike individuals, do not

6  themselves have states of mind[.]" *Id.* The Ninth Circuit has also recognized that an objective

7  standard applies to municipal defendants. *Id.* (citing *Gibson v. County of Washoe*, 290 F.3d 1175,

8  1195 (9th Cir. 2002)).

9       Thus, NaphCare must demonstrate that there is no genuine dispute of material fact that its

10  policies concerning preventing the spread of Covid-19 within the jail were objectively

11  reasonable.

12       **2. Analysis**

13       NaphCare has written policies in effect at WCDF, including a policy for prevention and

14  control of infectious disease as well as a pandemic response policy. The prevention and control

15  of infectious disease policy was updated and revised on January 30, 2020, and the pandemic

16  response policy was updated and revised on March 1, 2020. (Cain Decl., ECF No. 37 at 53 ¶ 3;

17  Infectious Disease, Prevention and Control policy at ECF No. 37 at 56-64; Pandemic Response

18  policy at ECF No. 37 at 66-68.)

19       In support of its motion, NaphCare also submits the affidavit of James E. Leggett, Jr.,

20  M.D., who is board-certified in internal medicine, infectious diseases. (Leggett Aff., ECF No. 37

21  at 48 ¶ 1.) He was retained to opine on the issue of standard of care as applied to NaphCare's

22  policies for reducing the risk of transmission of infectious diseases, including Covid-19, at

23  WCDF, and to determine whether WCDF took reasonable measures to reduce the risk of spread

of Covid-19. (*Id*. ¶ 3.) Dr. Leggett reviewed the complaint, amended complaint and screening order, as well as NaphCare's infectious disease prevention and control policy (revised January 30, 2020), NaphCare's pandemic response policy (revised March 1, 2020), and Plaintiff's deposition. (*Id*. at 49 ¶ 6.)

Dr. Leggett states that because Covid-19 is a novel coronavirus, the recommendations as to reasonable measures to reduce the risk of spread have evolved and changed over time. It is now understood that the primary method of transmission is through close contact with an infected person, *i.e.*, when virus-containing particles exhaled by an infected person get into the mouth, nose or eyes of other people who are in close contact with the infected person. (*Id*. ¶ 8.)

Based upon his review of NaphCare's written policies and procedures regarding infectious disease prevention and control and its pandemic response, he opines that NaphCare's policies were and are reasonable and fall within the standard of care for reducing the spread of Covid-19 and other infectious diseases at WCDF. (*Id*. at 50 ¶ 9.) He states that NaphCare's policies set forth reasonable standard precautions to reduce or minimize exposure and spread of infectious diseases, including handwashing and facemasks when appropriate. He also contends that NaphCare has reasonable policies regarding screening and isolating individuals who may have been exposed to Covid-19 or are potentially showing signs and symptoms of the illness. (*Id*.) Finally, he states that there is no evidence that NaphCare staff did not implement reasonable standard precautions to reduce or minimize exposure and spread of infectious diseases, including Covid-19. (*Id*. ¶ 10.)

Dr. Leggett opines that NaphCare's policies for preventing the spread of Covid-19 within WCDF are reasonable, without describing exactly what *specific policies* NaphCare implemented to prevent the spread of Covid-19. Dr. Leggett generally references handwashing, face masks

and screening, based on his review of NaphCare's written policies; however, the written policies are highly generalized and vague as to what measures should be taken in response to a pandemic caused by virus transmitted through respiratory droplets such as Covid-19. As will be discussed further below, the written policies reference handwashing and face masks in a discussion of contact with bodily fluids or blood splatter, but not in the context of transmission of a virus through respiratory droplets. The written policies also generally mention screening and isolation, but do not discuss specific procedures, let alone what protocols were used in response to Covid-19.

The infectious disease prevention and control policy states that it provides guidelines for the management of and reduction of unnecessary exposure to infectious and communicable diseases. (ECF No. 37 at 56.) The policy asserts that a comprehensive "infection control program" will be implemented that is based on guidelines established by the Center for Disease Control and Prevention (CDC), the Occupational Safety and Health Administration (OSHA), and the Association for Professionals in Infection Control and epidemiology, along with other nationally recognized infection control organizations. (*Id.*) The "infection control program," however, has not been provided to the court, and Dr. Leggett indicate that he reviewed that program.

The infectious disease policy references an "exposure control plan" which defines the approach to eliminating or minimizing employee exposure to bloodborne and airborne pathogens. (ECF No. 37 at 58.) The "exposure control plan" discusses handwashing and use of gloves to reduce the spread of communicable disease, and states that staff have a responsibility to wash their hands using soap and water. (*Id.*) Gloves are to be used when there may be contact

1 with bodily fluids. (*Id*.) Plaintiff's amended complaint, however, does not raise the issue of

2 inadequate precautions in terms of handwashing.

3    The "exposure control plan" also discusses facial protection, but states that face masks,

4 eye protection or face shields are required for everyone whose job entails potential exposure to

5 *blood via splash* to the face, nose or eyes. (*Id*.) It does *not* address facial protection, for staff or

6 inmates, in the context of a respiratory virus transmitted through droplets. The infectious disease

7 policy also states that "airborne precautions" for patients suspected of having a disease spread

8 through droplet nuclei should be used, without describing what those precautions are. It says that

9 details of the precautions can be found in the "infection control manual," but that manual also

10 has not been provided to the court. (ECF No. 37 at 60.) Nor does Dr. Leggett indicate that he

11 reviewed the manual.

12    Dr. Leggett also states that NaphCare's reasonable policies include screening and

13 isolating individuals who may have been exposed to the virus. The infectious disease policy

14 generally states that isolation cells are to be used to separate any potentially infectious patients

15 from the rest of the population (ECF No. 37 at 60), but it does not describe *the process* related to

16 screening, isolation or quarantining individuals with respect to Covid-19.

17    The policy also contains a discussion of "testing and treatment," which states in broad

18 terms that all patients will be assessed for possible infectious diseases upon admission, and those

19 who report or are observed as having signs and/or symptoms of an infectious disease will be

20 referred to an advanced clinical provider to initiate appropriate testing and treatment, but the

21 specifics regarding testing and treatment are largely limited to tuberculosis. (ECF No. 37 at 61-

22 64.)

23

The pandemic response policy is similarly generalized. It mentions a "pandemic response plan" that will be based on guidelines established by the CDC (ECF No. 37 at 66), but this plan has not been submitted to the court, and Dr. Leggett does not indicate he reviewed the plan.

The pandemic response policy gives examples of how triage might be conducted, such as by an arresting officer or by a patient experiencing symptoms during pre-booking, and states that the person should be placed in a designated area until further screening is conducted, and that further screening is to be conducted by a RN/LPN, who should utilize an N95 mask. (ECF No. 37 at 66-67.) It states that the RN/LPN is advised to order patients suspected of having the illness to be transported to the emergency room. (*Id.* at 67.) The policy does not discuss how incoming inmates (or staff) were actually screened for Covid-19 during the relevant time period, where inmates were placed when they had symptoms of Covid-19 or were close contacts of those who were confirmed or suspected Covid-19 cases. Nor does it discuss how long they were quarantined or isolated before being released to general population. There is also no mention of the use of masks (N95 or otherwise) by staff or inmates in contexts other than staff screening of those with symptoms.

The pandemic response policy states that there should be a site for isolation and there should be a plan about where to isolate individuals when those areas are full or unavailable (*id.*), but this plan was not submitted to the court, and Dr. Leggett does not state that he reviewed the isolation plan.

Each of these written policies mention that the "plans," but the "plans," which may contain more specific information, have not been provided to the court. The written policies state that these "plans" are based on CDC guidelines, but neither NaphCare nor Dr. Leggett mention the CDC's interim guidance for managing the spread of Covid-19 in correctional facilities that

was issued on March 23, 2020, or subsequent updates to this guidance.[6] The existence of written policies has little meaning if the court cannot discern what policies were (or were not) implemented or complied with in reference to the Covid-19 pandemic.

In sum, the court cannot say there is no genuine dispute of material fact as to whether NaphCare's policies were objectively reasonable without knowing what the policies are and how they have been implemented in the context of Covid-19. In other words, neither NaphCare nor Dr. Leggett explain what NaphCare's specific policies were during the relevant time period regarding screening new inmates and screening staff for Covid-19; testing inmates for Covid-19; the use of face masks for staff and inmates; and social distancing; all of which correlate to the allegations of Plaintiff's amended complaint.

It may well be that NaphCare implemented objectively reasonable policies in response to the Covid-19 pandemic, but that court cannot make that determination based on this record. NaphCare has not met its burden of demonstrating it is entitled to summary judgment; therefore, NaphCare's motion should be denied.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **STRIKING** Plaintiff's sur-reply (ECF No. 48);

(2) **DENYING** Plaintiff's Rule 56(d) request;

(3) **DENYING** Plaintiff's request for the appointment of counsel; and

(4) **DENYING** NaphCare's motion for summary judgment (ECF No. 37).

---

[6] The CDC's March 23, 2020, interim guidance on managing Covid-19 in correctional and detention facilities can be found here: https://www.bop.gov/foia/docs//CDCCorrectionalfacilityguidance3.23.pdf, last visited September 27, 2021.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: September 29, 2021

William G. Cobb
United States Magistrate Judge